UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JAJA O. ENDSLEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Cause No. 1:12-cv-333-WTL-DML |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| | ) |
| Defendant. | ) |

### ENTRY ON JUDICIAL REVIEW

Plaintiff Jaja Endsley requests judicial review of the final decision of Defendant Michael J. Astrue, Commissioner of the Social Security Administration ("Commissioner"), denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Insurance Benefits ("SSI") under Titles II and XVI of the Social Security Act (the "Act"). The Court rules as follows.

### I.   PROCEDURAL HISTORY

Endsley applied for SSI and DIB in March 2009, alleging that he had been disabled since August 15, 2006, due to several prior back surgeries, spinal cord stimulator implant, high blood pressure, and high cholesterol. His applications were denied initially on May 29, 2009, and on reconsideration on July 20, 2009, after which he requested and was granted a hearing before an Administrative Law Judge ("ALJ"). On December 14, 2010, Endsley, who was represented by counsel, appeared for a hearing before ALJ Ronald T. Jordan. At the hearing, the ALJ heard testimony from Endsley and vocational expert Ray Burger. Thereafter, on February 23, 2011, the ALJ rendered his decision in which he concluded that Endsley was not disabled under the terms of the Act. The Appeals Council denied Endsley's request for review of the ALJ's decision on February 6, 2012. Endsley then filed this action for judicial review.

## II.    MEDICAL HISTORY

Endsley has a history of back pain dating to 2001 when he suffered an injury at work. An MRI taken in October 2001 revealed "a central broad-based disc herniation [at L5-S1 segment] that contracts the S1 nerve root sheath but does not compress or dorsally displace them" and at L4-5, "a small central broad-based disc herniation without significant stenosis or any signs of neural compression." The MRI also showed a "small bright signal intensity fluid component . . . suggesting residua of hematoma or small ganglion cyst." In March 2002, Endsley underwent microdiscectomy surgery. A functional capacity evaluation dated December 11, 2002, suggested Endsley was capable of working at a medium level of physical demand.

Endsley visited the emergency room for his back pain in May 2006, where his examination results indicated "left-sided paraspinal muscle palpable tenderness over the lumbosacral back." At this time, Endsley complained of having suffered another work-related injury one month earlier.

In August 2006, Endsley was involved in yet another work-related accident while working as a forklift driver, which caused his allegedly disabling injuries. An MRI was performed in September 2006 and Dr. Remley concluded that Endsley had degenerative disc disease at L5-S1 with interval development of small left-sided disc extrusion that abuts and mildly compresses the left S1 nerve root, status post right hemilaminectomy and discectomy at L5-S1 with postoperative hard disc osteophyte complex and epidural scarring, and moderate disc degeneration at L4-5. On October 27, 2006, Dr. Langhorst performed a left S1 selective nerve root block.

In November 2006, Endsley underwent left microlumbar discectomy at L5-S1. It was noted that "the patient tolerated the procedure without complications and was taken to the recovery

room in stable condition."

On January 4, 2007, Endsley met with Dr. Langhorst for the first time. On examination, Dr. Langhorst noted Endsley's ability to heel walk, toe walk and rise from a squat. Dr. Langhorst prescribed Hydrocodone, Lyrica, and Zanaflex and ordered Endsley to return in four weeks.

On January 10, 2007, Endsley presented for a follow-up visit with Dr. Schwartz, at which time Endsley complained of continued pain in his buttock and thigh as well as having trouble sleeping. Dr. Schwartz prescribed Elavil to help with sleeping, leg pain, and depression and ordered an MRI.

In late January 2007, Endsley met with Dr. Schwartz for a full study with sedation. Dr. Schwartz concluded: "postoperative changes with right hemilaminotomy at L5-S1 and at L4-5, conjoined proximal nerve root of both L5 and S1 and mild broad-based disc bulge remaining at L5-S1 level, with continued contact of the S1 nerve root."

On February 12, 2007, Endsley underwent a psychological evaluation, after which Dr. Gregory Hale, a licensed clinical psychologist, identified Endsley as suffering "pain disorder associated with psychological factors and a general medical condition." Dr. Hale recommended Endsley undergo a series of psychological consultations to help him learn to manage his pain.

Endsley presented for another follow-up visit with Dr. Schwartz on March 6, 2007, at which time Endsley complained of leg pain. Dr. Schwartz indicated that an MRI showed "no evidence of nerve compression" and that he was "at a loss for anything surgical." Dr. Schwartz recommended a visit with Dr. Jon Swofford for possible spinal cord stimulator placement. After meeting with Dr. Swofford in March, a spinal cord stimulator was implanted on May 21, 2007.

Endsley underwent a functional capacity evaluation on August 27, 2007. In summary of his

evaluation, the reviewer explained that Endsley displayed "variable effort" and "gave minimal effort with static and dynamic lift testing," while his pain questionnaires "indicated strong tendencies toward inappropriate illness behavior." Nonetheless, Endsley was assessed as falling in the "light" physical demand level for lifting and "sedentary" physical demand level for carrying.

On September 5, 2007, Endsley underwent a follow-up functional capacity evaluation by Dr. Langhorst. Dr. Langhorst prescribed the following restrictions for Endsley: no lifting from floor to waist, lifting restrictions from waist up of 15 pounds or less, and occasional push/pull of up to 45 pounds.

Additionally, in November 2007, Endsley underwent an evaluation at Total Spine Care. Dr. Dreihorst examined Endsley and noted tenderness in the left hip and lower two midline lumbar scars and tight gluteal muscles. Furthermore, Endsley's range of motion was limited to forward and back bending and he noted pain in the low back. Lastly, Endsley expressed back and left leg pain when seated with straightened right leg. Dr. Dreihorst noted that Endsley was at maximum medical improvement.

In May 2009, Endsley underwent a consultative examination under the direction of the Social Security Administration. During the examination, which was performed by Dr. Rudolph, Endsley demonstrated an assisted gait with cane, but did not flex his foot with gait when assisted or unassisted. Moreover, Endsley did not attempt walking on heels or toes, squatting or standing. Overall, Dr. Rudolph concluded Endsley had lower back pain, hypertension, and hypercholesterolemia.

Also in May 2009, Dr. R. Bond completed an RFC assessment indicating that Endsley had some exertional limitations; specifically, Endsley should not occasionally lift more than twenty

4

pounds, frequently lift no more than ten pounds and stand or walk at least two hours in an eight-hour work day and sit a total of six hours in an eight-hour work day. With regard to postural limitations, Endsley could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl, but he should never climb ladders, ropes, or scaffolds. Dr. Bond found that Endsley was "partially credible" but that there was no recent medical evidence to support the severe pain alleged. Dr. Bond noted that Endsley showed decreased grip strength, but that was not consistent with his back disorder, nor was it supported by other examinations.

On May 28, 2009, agency reviewer A. Johnson completed a case analysis and opined that Endsley's disorder equaled Listing 1.04C for spinal disorders, as Endsley had "severe mobility limitations" and the medical record supported a long history of "back impairment."

Primary care physician Dr. Chrystal Anderson completed a physical capacities evaluation on November 29, 2010. Dr. Anderson indicated that Endsley had been diagnosed with chronic low back pain and his prognosis was "fair." She indicated that he should not engage in prolonged standing, walking, or sitting greater than one to two hours. Accordingly, she limited him to sitting, standing, and walking for one hour total at one time, sitting for four hours total during an eight-hour workday, and standing and walking in combination for one hour total each day. Dr. Anderson determined that Endsley could frequently lift and carry up to ten pounds and occasionally lift and carry ten to twenty pounds, but that he should never lift or carry weight over twenty pounds; he could use both hands for repetitive action, but he should not use his feet for repetitive pushing and pulling of leg controls. Furthermore, Endsley was unable to squat, crawl, climb, stoop, balance, kneel, and crouch, but could occasionally bend and frequently reach. Lastly, Dr. Anderson indicated that Endsley should be totally restricted from unprotected heights and

heavy machinery, and moderately restricted from driving automotive equipment.

At the time of his testimony at the hearing, Endsley was thirty-five years old and his most recent past relevant work was as a forklift driver. He explained that he had settled his workers' compensation claim, and as part of that settlement, he was going to pursue vocational rehabilitation. Endsley had not yet taken any affirmative steps towards vocational rehabilitation, but he was thinking about working from home. Endsley testified that his spine stimulator helped reduce his pain. He reported that he tried to stay away from other people and he drove, although not long distances. Endsley's family members helped with household chores and shopping.

### III. APPLICABLE STANDARD

Disability is defined as "the inability to engage in any substantial gainful activity by reason of a medically determinable mental or physical impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of at least twelve months." 42 U.S.C. ' 423(d)(1)(A). In order to be found disabled, a claimant must demonstrate that his physical or mental limitations prevent him from doing not only his previous work, but any other kind of gainful employment that exists in the national economy, considering his age, education, and work experience. 42 U.S.C. ' 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner employs a five-step sequential analysis. *Weatherbee v. Astrue*, 649 F.3d 565, 568-69 (7th Cir. 2011); 20 C.F.R. ' 404.1520(b).[1] The first step considers whether the applicant is engaged in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the

---

[1] For the sake of simplicity, this Entry contains citations to DIB sections only.

impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity ("RFC") and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience, to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

On review, the ALJ's findings of fact are conclusive and must be upheld by the court "so long as substantial evidence supports them and no error of law occurred." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *id.*, and the court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala,* 999 F.2d 180, 181 (7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ is required to articulate only a minimal, but legitimate, justification for his acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). The ALJ must articulate his analysis of the evidence in his decision; while he "is not required to address every piece of evidence or testimony," he must "provide some glimpse into [his] reasoning . . . [and] build an accurate and logical bridge from the evidence to [his] conclusion." *Id.*

## IV.    THE ALJ'S DECISION

Applying the five-step analysis, the ALJ found that Endsley was not disabled from August 15, 2006, through the date of his decision on February 23, 2011. At step one of the analysis, the ALJ found that Endsley had not engaged in substantial gainful activity ("SGA") since August 15, 2006. At steps two and three of the analysis, the ALJ determined that Endsley suffered from a combination of severe and non-severe impairments. Specifically, the ALJ found that Endsley had the following non-severe impairments: high blood pressure, hyperlipidemia, diabetes mellitus, depression, and anxiety. The ALJ concluded that Endsley had the severe impairments of a disorder of the lumbar spine and obesity, but the ALJ determined that neither of these severe impairments met or medically equaled a listed impairment. At step four, the ALJ concluded that Endsley retained the residual functional capacity ("RFC") to perform sedentary work with the following exceptions: lift, carry, push, and pull twenty pounds occasionally and ten pounds frequently, and stand/ walk two hours in an eight-hour day and sit six hours. Endsley must have the opportunity to stand at his work station up to five minutes each hour at his discretion. He must avoid postural activities such as bending, stooping, crouching, crawling, kneeling, and climbing, but he can bend at the waist sufficiently to perform work at a bench, table, or desk. The ALJ concluded that, given Endsley's RFC, he was unable to perform any past relevant work as a forklift driver and sales clerk. However, considering his age, education, work experience, and RFC, the ALJ found that Endsley was capable of performing other jobs that exist in significant numbers in the regional economy, including such representative occupations as cashier, office clerk, or packer. Therefore, the ALJ determined at step five that Endsley was not disabled.

## V. DISCUSSION

### A. Somatoform Disorder

The majority of Endsley's objections to the ALJ's decision implicate the ALJ's alleged failure to consider Endsley's diagnosis of somatoform disorder, which failure is alleged to have tainted the ALJ's listing and credibility determinations.

"'Somatoform disorder' refers to what used to be called 'psychosomatic' illness: one has physical symptoms, but there is no physical cause." *Sims v. Barnhart*, 442 F.3d 536, 537 (7th Cir. 2006). According to Endsley, the ALJ rejected Dr. Hale's diagnosis of somatoform disorder and substituted his own diagnosis of "pain disorder associated with psychological factors and a general medical condition." However, it is Dr. Hale, not the ALJ, who diagnosed Endsley with a "pain disorder associated with psychological factors and a general medical condition." Tr. at 296. The ALJ therefore did not "substitute" his own diagnosis. Furthermore, while Dr. Hale opined that "Endsley present[ed] with a clinical profile corresponding with patients exhibiting a somatoform disorder; that is, he described an extreme focus on his physical complaints," and "showed evidence of somatization," the doctor ultimately concluded that "the psychological disorder identified (i.e., Pain Disorder Associated with Psychological Factors and a General Medical Condition) is understood to be causally-related to the August 2006 work-related accident." Dr. Hale clarified the aspect of somatoform disorder he saw – an extreme focus on his physical complaints – but specifically attributed Endsley's pain to a known cause. The ALJ therefore did not err in his analysis of Dr. Hale's report. As the ALJ did not err in this way, it follows that his alleged error did not taint his listing and credibility determinations, as described below.

9

### 1. *Somatoform Disorder Listing*

With respect to the listing determination, Dr. Hale's report was by itself insufficient to trigger an analysis of the somatoform disorder listing. Furthermore, there is no other suggestion anywhere in the record that Endsley might meet or medically equal this listing. There was thus no medical opinion that Endsley suffered from somatoform disorder, and the ALJ thus did not err by not citing the listing and conducting the analysis, nor did he err by failing to call a medical expert to analyze Endsley's impairments under this listing.

### 2. *Credibility Determination*

Endsley argues that the ALJ's credibility determination is erroneous because the ALJ failed to make findings on the second factor required to be considered when rejecting evidence regarding a claimant's subjective symptoms pursuant to SSR 96–7p.

The specific error alleged here is that the ALJ failed to consider Factor 2 – "the location, duration, frequency, and intensity of the individual's pain or other symptoms" – when the ALJ overlooked Dr. Hale's "diagnosis" of somatoform disorder and its relationship with Endsley's pain, and instead "substituted" his own diagnosis. However, given that there was no diagnosis of somatoform disorder, nor a "substitution" by the ALJ, it was not improper for the ALJ to leave out an analysis of this "diagnosis" under SSR 96-7p, factor 2.[2]

### B. **Mental Impairments**

Endsley contends the ALJ erred in his analysis of Endsley's mental impairments when he "ignored Dr. Hale's findings" regarding his functioning. According to Endsley, Dr. Hale's report

---

[2] In his reply, Endsley takes new aim at the ALJ's use of impermissible boilerplate. While it is true that the ALJ repeats the disfavored boilerplate language in his analysis of credibility, the ALJ goes on to complete a thorough and sound analysis of the evidence.

"proved clearly" that Endsley had "marked impairment" in daily functioning and "marked impairment" in social functioning. On close review, the Court is unable to say whether Dr. Hale's report "clearly proves" that Endsley has "marked" limitations in these areas; however, it is clear that the ALJ did not fully appreciate the limitations outlined in Dr. Hale's report. Specifically, the ALJ found that Endsley had "no limitation" in areas of daily living, yet Dr. Hale noted that Endsley's grandmother cooked for him, his mother transported him to appointments, and his brother or fiancé helped him wash his legs or feet. Endsley also reported difficulty sleeping. Likewise, with respect to social functioning, the ALJ found that Endsley had "no limitation," but Dr. Hale noted that Endsley spent time watching movies or playing video games and was "sensitive to the reactions of others." Endsley also testified at the hearing that he tried to avoid others. The ALJ's finding that Endsley had "no limitation" in these areas is therefore not supported by substantial evidence of record and must be reversed.[3]

### C.     Spinal Disorder

According to Endsley, the ALJ also erred when he concluded that Endsley's spinal ailments did not meet or equal Listing 1.04. The ALJ determined that there was no "supporting evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication with the specific criteria in accordance with the listing." Endsley points out, however, that state agency reviewer A. Johnson found that Endsley's spinal impairments equaled Listing 1.04C and the ALJ did not address this opinion. According to the Commissioner, this reviewer is not a physician and therefore her opinion carries little weight. As an initial matter, the

---

[3] However, the Court does not agree with counsel's exaggeration that Endsley was "almost totally dysfunctional" and therefore was markedly limited in concentration, persistence, and pace.

11

Commissioner's response is problematic because it engages in the analysis that the ALJ should have performed, but did not. However, even more problematic is an ambiguity in the record: Reviewing physician Dr. J. Sands affirmed the "assessment of 5/28/2009;" however, both Johnson's finding that Endsley met Listing 1.04C and Dr. Bond's RFC assessment, indicating an ability to work, are dated 5/28/2009. It appears that the state agency credited Dr. Bond's assessment when it denied Endsley's claim. Tr. at 47. However, regardless of whether Dr. Sands affirmed Dr. Bond or Johnson, a more thorough analysis of Endsley's claim under 1.04C is warranted by the record.

Furthermore, Endsley points to two medical records – one from September 2006 and one from January 2007 – that he argues indicate nerve root compression. The Commissioner attempts to distinguish these records on the ground that they indicate *mild* nerve root *impingement* as opposed to *compression*. Likewise, the Commissioner engages in an analysis of Endsley's medical records with regard to spinal stenosis. But it is the ALJ who should have conducted this analysis in rejecting the Listing, not the Commissioner now that the case is on appeal.

In sum, the ALJ failed to build an accurate and logical bridge that minimally articulated a justification for rejecting the spinal disorder listing. This is error requiring reversal.

### D.     Residual Functional Capacity

Finally, Endsley argues that the ALJ erred when he determined that Endsley was not disabled because he could perform some jobs. The source of this error, Endsley argues, is omitting from the RFC limitations due to Endsley's "quite severe chronic pain, as described in detail by . . . Dr. Anderson." Endsley contends that he "would not be able to sustain full time work and thus could not sustain any competitive employment."

12

However, a comparison of Dr. Anderson's RFC to the ALJ's reveals but a few differences; the ALJ adopts all of Dr. Anderson's lifting and carrying restrictions, as well as her postural limitations. The only differences are the amount of time Endsley can sit during a work day – Dr. Anderson limits him to four hours, the ALJ limits him to six – and the amount of time Endsley can stand and walk during a work day – Dr. Anderson prescribes one hour, while the ALJ limits Endsley to two hours. The ALJ rejected Dr. Anderson's figures on the ground that her opinion was not supported by her own medical records and she therefore "apparently relied quite heavily on the subjective report of symptoms and limitations provided by [Endsley]." In rejecting these subjective reports, the ALJ found that there existed "good reasons for questioning the reliability of the claimant's subjective complaints." As the Court has found no error in the ALJ's analysis of Endsley's credibility, it finds no error in the ALJ's rejection of these portions of Dr. Anderson's RFC here. The ALJ therefore did not err when he adopted the figures of state agency reviewer Dr. Bond – that Endsley could sit for six hours and stand/walk for two hours – in lieu of Dr. Anderson, and his RFC analysis is supported by substantial evidence.

## VI. CONCLUSION

As set forth above, the decision of the Commissioner is **REVERSED** and **REMANDED** for further proceedings consistent with this Entry.

SO ORDERED: 03/07/2013

_William T. Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication.